Filed 12/26/24

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>DANA WILLIAM STUBBLEFIELD,<br><br>    Defendant and Appellant. | H048598<br>(Santa Clara County<br>Super. Ct. No. F1660022) |

Defendant Dana William Stubblefield is a Black man publicly known as a former professional football player in the National Football League. Jane Doe, an intellectually disabled woman, reported to police that Stubblefield raped her at gunpoint when she went to his house in Morgan Hill to interview for a babysitter job. A jury found Stubblefield guilty of forcible rape, forcible oral copulation, and false imprisonment. The jury further found he personally used a firearm in the commission of the first two offenses. The trial court sentenced Stubblefield to a term of 15 years to life in prison.

The prosecution alleged Stubblefield threatened Doe with a handgun while she was at his house. The police, however, had decided not to search Stubblefield's house after Doe reported the incident, and no gun was introduced into evidence. In closing arguments, the prosecutor asserted the police made the decision not to search Stubblefield's house based partly on the fact that he was a famous Black man. The prosecutor claimed a search would have opened up "a storm of controversy," and added, "Can you imagine in Morgan Hill when they search an African-American --," whereupon

defense counsel objected. The trial court sustained the objection but gave the jury no admonishments or instructions with respect to this part of the prosecutor's arguments.

Stubblefield contends the prosecution's statements violated the California Racial Justice Act of 2020 (Racial Justice Act, or RJA). Closing arguments began July 21, 2020—eight weeks after a white police officer murdered George Floyd, setting off weeks of massive protests and nationwide social unrest. Stubblefield argues the prosecution appealed to racial bias by identifying his race as the reason for a weakness in the prosecution's case and tapping into a racially biased backlash against the protests. The Attorney General contends any violation was harmless beyond a reasonable doubt.

We find the prosecution violated the Racial Justice Act as codified in part at Penal Code section 745. The prosecution explicitly asserted Stubblefield's race was a factor in law enforcement's decision not to search his house. The statement implied the house might have been searched and a gun found had Stubblefield not been Black, and that Stubblefield therefore gained an undeserved advantage at trial because he was a Black man. Second, the claim that a search would "open up a storm of controversy" implicitly referenced the events that followed George Floyd's then-recent killing, appealing to racially biased perceptions of those events and associating Stubblefield with them based on his race.

We find the prosecution's statements constituted "racially discriminatory language about" Stubblefield's race within the meaning of Penal Code section 745, subdivision (a)(2), and we conclude his conviction was sought or obtained in violation of subdivision (a). We further conclude Penal Code section 745, subdivision (e)(2)(A) precludes harmless error analysis of this violation and mandates a specific remedy: We are required to vacate the conviction and sentence, find that it is legally invalid, and order new proceedings consistent with subdivision (a). (Pen. Code, § 745, subd. (e)(2)(A).)

Stubblefield contends the prosecution made other statements in violation of the Racial Justice Act, and he further contends the prosecution violated his due process rights

2

by making those statements.  Stubblefield also raises numerous claims of error beyond the Racial Justice Act.  Because we must reverse the judgment, vacate the conviction and sentence, and remand for further proceedings, we do not reach these claims.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

### A.  *Procedural Background*

The prosecution charged Stubblefield with five counts: count 1—forcible rape (Pen. Code, § 261, subd. (a)(2));[1] count 2—rape of a victim incapable of giving consent (§ 261, subd. (a)(1)); count 3—forcible oral copulation (former § 288a, subd. (c)(2)(A));[2] count 4—oral copulation with a person incapable of giving consent (former § 288a, subd. (g)); and count 5—felony false imprisonment (§§ 236, 237).  As to counts 1 through 4, the prosecution further alleged Stubblefield personally used a firearm in the commission of the offenses (§§ 667.61, subds. (b) & (e), 12022, 12022.3, 12022.5, 12022.53).

The trial began in March 2020, but it was paused two weeks later due to the onset of the COVID-19 pandemic.  The trial resumed three months later, and in July 2020, the jury found Stubblefield guilty of forcible rape, forcible oral copulation, and false imprisonment.  The jury also found Stubblefield personally used a firearm in the commission of the forcible rape (count 1) and forcible oral copulation (count 3).  The jury acquitted Stubblefield on count 2 (rape of a victim incapable of giving consent) and count 4 (oral copulation with a person incapable of giving consent).

In October 2020, the trial court sentenced Stubblefield to an aggregate term of 15 years to life in prison.  The sentence consisted of a term of 15 years to life on count 1; a concurrent term of 15 years to life on count 3; and a three-year term on count 5, stayed under section 654.

---

[1] Subsequent undesignated statutory references are to the Penal Code.

[2] Effective January 1, 2019, section 288a was amended and renumbered as section 287.  (Stats. 2018, ch. 423, § 49.)

### B. *Facts of the Offenses*

Stubblefield is a Black man and a former professional football player in the National Football League. In April 2015, he was 44 years old, six feet three inches tall, and weighed about 340 pounds. He lived in a house in Morgan Hill with his wife and two children. Jane Doe was an intellectually disabled 31-year-old woman living with her mother in Hollister. Her driver's license stated she was five feet three inches tall and weighed about 125 pounds.

Doe alleged Stubblefield raped her at gunpoint when she went to his house to interview for a babysitter job. Stubblefield argued Doe consented to sex in exchange for money.

#### 1. *Timeline of the Incident Based on Text Messages*

In April 2015, Stubblefield contacted Jane Doe through a profile she made on SitterCity.com, a Web site for hiring childcare workers. They exchanged text messages and arranged to meet at Stubblefield's house for an interview. Stubblefield texted Doe with the address of his home in Morgan Hill. Doe responded with a message indicating the drive to Morgan Hill was long, and Stubblefield responded that he would pay her for her time. Doe drove to Stubblefield's home on the afternoon of April 9, 2015, and she texted him when she arrived at 2:47 p.m. She stayed at the house for about 23 minutes and left.

At 3:10 p.m., Stubblefield texted Doe, "I wanted to pay you for coming down today," and added, "You left so fast." Doe drove back to his house and texted him when she arrived again at 3:15 p.m. She stayed at the house for about 30 minutes and left. At 3:45 p.m., Stubblefield texted Doe, "U got money's," and she responded, "Yes." Stubblefield then texted, "See u Saturday at 11 with kids," and Doe responded, "Ok."

#### 2. *Testimony of Jane Doe*

A prefatory note is necessary to provide fair and appropriate context for our summary of Doe's testimony. Doe's scores in IQ tests were in the second percentile, and

she suffered from a language disorder that hampered her ability to speak and testify clearly. Her responses to questions were often nonresponsive, unintelligible, or syntactically fractured. At times, she could not verbally express her response, so she wrote it on paper. She appeared to have difficulty describing the chronological order of events or understanding how a question related to timing and sequence. Consequently, segments of her testimony are difficult to understand or encapsulate.[3] Nonetheless, the following narrative can be distilled from the transcripts with reasonable faithfulness to the record:

According to her testimony, when Doe met Stubblefield at his house, he was the only one there. Stubblefield introduced himself as "Dana." He did not say anything about playing football, and Doe did not recognize him or know that he had played football.

The first time Doe arrived at Stubblefield's house, he invited her into the kitchen, where they discussed his kids and the details of the childcare services she would provide. They anticipated that Doe would start the following Saturday, and Stubblefield offered to pay her an hourly rate of $20 or less. They talked for around 10 to 20 minutes, and Doe left.

As Doe was driving away, Stubblefield texted her to come back so he could give her money. She went back, and he invited her into the house to give her $80. When she

---

[3] By way of example, a transcript of Doe's statements to the police includes this excerpt:
"[Detective:] [D]id he make you have sex with him the first time you were at the house or the second time?
[Doe:] First, first.
[Detective:] The first time.
[Doe:] Oh, not second time.
[Detective:] The second time?
[Doe:] Yeah, not both time.
[Detective:] Okay, so the first time—
[Doe:] I went his kitchen."

5

entered the house, he locked the door. He then picked her up and took her into a dark room that had a bed and dresser. She told him, "No," and, "I don't want no money." She insisted she had to leave, but he would not let her go. He took a photo of her driver's license and gave her $80.

Stubblefield pulled Doe's pants down and put her on the bed. She did not scream or try to fight him because he had big muscles. Doe told him she did not want to have sex. After pulling her pants down, Stubblefield pointed a gun at her and told her, "I am going to kill you." Doe indicated that Stubblefield pointed the gun at either her lower stomach area or her vagina. The prosecutor asked Doe what the gun looked like, and she responded, "Small black one. I can't see, too dark." She thought he might have been hiding the gun in the dresser or in the bed, but she did not see where he got it from.

Stubblefield then had sex with Doe. He put his mouth on her vagina and put his penis inside her. Doe told him to stop, but he kept going. She estimated that the penetration continued for a couple of minutes. Stubblefield told Doe to put his penis in her mouth before he penetrated her, but she could not remember whether his penis went into her mouth. He told her to put his penis in her mouth again before she left, and she told him, "No. I have to go." Stubblefield put his penis in her mouth for one or two minutes. He also lifted her shirt up and put his mouth on her breasts. Doe again told Stubblefield she had to leave, but he said he wanted a "[l]ittle bit more sex." He said he was almost done, but he continued. Stubblefield eventually stopped and let Doe go. Doe left the house and drove straight to the police station. She gave the police the $80 in cash that Stubblefield had given her.

Doe's statements to the police were generally consistent with her testimony as summarized by the above narrative, but some portions of her statements and testimony were too ambiguous or confusing to allow for a meaningful comparison. On both occasions, she gave ambiguous or confusing answers to questions about whether

6

Stubblefield paid her the money in exchange for sex. Similarly, she gave ambiguous or confusing answers to questions about whether she saw the gun.

Some parts of her testimony were clearly inconsistent with her statements to the police. Doe told the police Stubblefield had shoved the gun into her vagina. In the prosecutor's direct examination, Doe confirmed that she told the police, " 'Yeah, other times he just shoves it in 'gina'." In cross-examination, Doe repeatedly denied making that statement to the police. In redirect examination, the prosecutor asked Doe about her statement again, and Doe denied that she told the police Stubblefield put the gun inside her vagina. The prosecutor then showed Doe a transcript of her statement to the police, and he verbally recited that portion of the transcript to Doe. Doe then testified that she did not remember making that statement to the police.

Defense counsel questioned Doe about two online campaigns she started, seeking monetary donations on the GoFundMe Web site—one seeking $14,000 by falsely representing she was sick with ovarian cancer, and another seeking $9,000 because her father had died, without disclosing the death occurred when she was a little girl. The parties stipulated that Doe's identity had been verified by GoFundMe and her bank account was linked to her GoFundMe account, but she never received any money through these efforts. Doe repeatedly denied that she had set up the campaigns. After counsel continued to question her about a printout of the GoFundMe page for the ovarian cancer campaign, she eventually admitted she set it up, but she claimed she did not mean to do so. After she testified that the GoFundMe cancer campaign was the only time she had started a campaign, counsel questioned her about a printout of the campaign page for her father's death. She repeatedly denied setting up that campaign before admitting she did so, but she denied that she was trying to get money from anyone.

Doe denied that she was "desperate for money" at the time of the incident. Defense counsel questioned Doe about whether she had made posts on Facebook praying and pleading for money prior to the incident, and she denied doing so. Counsel asked her

7

to look at a printout of a Facebook post, and she refused to do so, insisting, "I don't put nothing on Facebook." After the court persuaded Doe to look at the document, she denied making the post. When asked about another post pleading for money, she admitted it was hers, but she added, "I think it was an old one," and, "Only joking." When asked about other similar posts, Doe denied making them. Defense counsel questioned Doe about numerous other instances of Internet activity and posts advertising various products and services for money, and she denied making some of them but admitted she had made some of the others.

Doe testified that she did not know what the National Football League was, and that she had never heard of the San Francisco 49ers.[4] When defense counsel asked Doe about a Facebook post discussing football and the Miami Dolphins, she responded, "Long time," and, "Not no more," before admitting the Miami Dolphins were her favorite football team. When asked about a post stating, "I like the 49ers, too," Doe responded, "Yes, long time. Not no more. That old one." Counsel asked Doe whether she had seen any 49ers jerseys, Super Bowl trophies, or giant framed photographs of Stubblefield at the Super Bowl when she was in the hallway and kitchen at Stubblefield's house. She denied that she saw any of those things, and she testified that Stubblefield did not tell her he used to be a football player.

### 3. The Initial Police Investigation Regarding Stubblefield's Identity

Detective Sheena Woodland testified about her initial interview with Doe after she arrived at the Morgan Hill police station. According to a police dispatch log entry, Doe arrived at the station around 4:15 p.m. A note in the log entry stated, "Asian-speaking female, possible 5151 [*sic*], mumbling about someone chasing her."[5] Doe made an initial

---

[4] Stubblefield played for the San Francisco 49ers for much of his professional football career.

[5] There is no evidence in the record that Doe spoke any languages of Asian origin.

statement to a patrol officer and gave him her phone with the text messages on it. Doe described Stubblefield as a Black man named "Dana."

Detective Woodland then interviewed Doe and obtained a detailed statement generally consistent with the above narrative. Detective Woodland examined the text messages on Doe's phone, which included the phone number used to send the texts Doe had received. Detective Woodland checked the phone number against a police database and determined it was Stubblefield's number. She also requested a records check on the address provided by Stubblefield in his texts, and she determined it was Stubblefield's residence. Based on Doe's allegation that Stubblefield had threatened her with a gun, Detective Woodland checked a law enforcement firearms database and determined that firearms had been registered to Stubblefield in the past.

Detective Woodland presented Doe with a lineup of six photographs including one of Stubblefield. Detective Woodland testified that Doe looked at them, but she did not appear to be "seeing anything." When Detective Woodland first asked Doe if she could identify Stubblefield, Doe said, "No." Detective Woodland "asked her if she could try," and Doe said, "Yes." Detective Woodland testified that Doe "just kind of looked very brief, but didn't really seem to have much interest in looking at the photographs."

The police decided not to search Stubblefield's house. The prosecutor asked Detective Woodland, "Can you tell me *all* the factors that went into you not seeking a search warrant on April 9, 2015 at the defendant's house?" (Italics added.) She responded, "Because the victim did not make a photographic identification, we did not have enough to obtain a search warrant." Detective Woodland testified that her supervisor made the decision. The police decided to wait until they had further evidence, such as a DNA analysis of samples collected during the SART exam. In September 2015, they received the results of an analysis showing that Stubblefield's DNA was found on Doe, but they did not seek a warrant to search his house.

9

### 4. SART Examination

Doe underwent a SART examination at Valley Medical Center late in the evening following the incident. The examining nurse documented multiple lacerations and erythema—redness resulting from burst capillaries—in Doe's internal vaginal areas. There were no obvious injuries on any other part of her body. Based on the severity of the internal injuries, the examiner testified that the injuries were consistent with Doe's report of what had happened. The exam did not detect any semen.

Swabs taken from Doe's body during the SART exam were submitted for DNA testing. Stubblefield's DNA was found in a swab taken from Doe's left breast.

### 5. Stubblefield's Statement to the Police

The police contacted Stubblefield in January 2016, and he agreed to talk with them at the police station. Stubblefield brought his two young children with him, and they were present during the questioning. The prosecution played a video recording of the interview for the jury.

When the interviewing officer asked Stubblefield about hiring Jane Doe from SitterCity.com, he said he had contacted Doe but she never responded. He denied that Doe had ever been to his house. When the officer showed Stubblefield text messages between him and Doe, Stubblefield said she might have been a girl he had interviewed, but he could not remember her. When the officer asked Stubblefield about the text messages showing Doe had arrived at his house and the subsequent messages about returning for money, Stubblefield said the texts did not sound like his, and he stated again that he did not remember her. He denied ever having consensual sex with any of the nannies who came for a job.

### 6. Testimony Under Evidence Code Section 1108

Two witnesses testified that Stubblefield had sexually assaulted them.

L. Doe testified that she and three friends met Stubblefield at a club in 2006. At some point, she and her friends got into Stubblefield's limousine with him and some of

10

his friends, and they went to his house. She was drunk, and she vomited in the limousine as well as the house. Later that night, she was alone in the car with Stubblefield, and she was too intoxicated to move or speak. Stubblefield unbuttoned her pants, put his hand inside her underwear, and touched her vagina. He tried to separate her legs, but she did not want him to touch her, and she kept her legs closed.

R. Doe and several friends met Stubblefield at a bar around 1995 or 1996. Her husband was a fan of the San Francisco 49ers, so she asked Stubblefield for an autograph. He told her he had something in the back of the bar that he would sign for her, and they went to a dark kitchen area. He lifted her onto a counter, pushed himself between her legs, and started kissing her. She tried to push him away and told him to stop, but he grabbed her arm and pulled her further into the kitchen. They ended up in an upstairs hallway where he pushed her onto the ground and got on top of her. He touched her breasts under her bra and grabbed her inner thigh. She told him to stop and tried to move out from under him, but all his weight was on her. When someone came upstairs and saw them, he pushed himself off her and left.

### 7. *Gun Evidence*

The police never searched Stubblefield's house in Morgan Hill and no guns were found at that location. In his statement to the police in January 2016, Stubblefield said he did not have any guns.

In April 2014, Stubblefield was living in San Jose when a police officer went to Stubblefield's home to recover a gun that was registered to him. One or two days later, Stubblefield gave the officer a gun, but the officer later realized it was a different gun—not the gun he had tried to recover. The officer called Stubblefield back several times, but he never responded, and the officer never located the gun he had tried to recover.

## II. DISCUSSION

Stubblefield contends the prosecution violated the RJA during closing arguments. He argues the prosecutor explicitly and implicitly appealed to racial bias by arguing that

11

police did not search Stubblefield's house partly because he was Black and a search would have resulted in a "storm of controversy."  A heading in the Attorney General's brief summarily states that Stubblefield's RJA claims have no merit, but as to the claim at issue here, the Attorney General's brief does not support that position with any argument.[6]  He contends that even assuming there was a violation, it was harmless beyond a reasonable doubt.

### A.  The California Racial Justice Act

The Legislature enacted the Racial Justice Act through the passage of Assembly Bill No. 2542 (2019-2020 Reg. Sess.).  "The Legislature passed the RJA in 2020 with a stated aim 'to eliminate racial bias from California's criminal justice system' and 'to ensure that race plays no role at all in seeking or obtaining convictions or in sentencing.'  (Stats. 2020, ch. 317, § 2, subd. (i).)  To that end, the RJA prohibits the state from seeking or obtaining a criminal conviction, or seeking, obtaining, or imposing a sentence, on the basis of race, ethnicity, or national origin.  [Citation.]"  (*People v. Wilson* (2024) 16 Cal.5th 844, 945-946.)  The RJA added section 745 to the Penal Code effective January 1, 2021, and the Legislature has since amended section 745 twice.  (Stats. 2020, ch. 317, § 3.5; Stats. 2022, ch. 739, § 2; Stats. 2023, ch. 464, § 1.)

Section 745, subdivision (a) sets forth four categories of conduct which, if proven by a preponderance of the evidence, establish a violation.  (§ 745, subds. (a)(1)-(a)(4).)  This case concerns the use of "racially discriminatory language" in violation of section 745, subdivision (a)(2).  As relevant here, a violation has occurred under that subdivision if "[d]uring the defendant's trial, in court and during the proceedings . . . an attorney in the case . . . used racially discriminatory language about the defendant's race, ethnicity, or national origin, or otherwise exhibited bias or animus towards the defendant because

---

[6] At oral argument, the Deputy Attorney General argued that the Respondent's Brief had not conceded the merits of the claim, and urged the court to reject Stubblefield's interpretation of the prosecution's statements.

of the defendant's race, ethnicity, or national origin, whether or not purposeful." In relevant part, " 'Racially discriminatory language' means language that, to an objective observer, explicitly or implicitly appeals to racial bias, including, but not limited to, racially charged or coded language . . . or language that references the defendant's physical appearance, culture, ethnicity, or national origin." (§ 745, subd. (h)(4).) Subdivision (a)(2) does not apply "if the person speaking is relating language used by another that is relevant to the case or if the person speaking is giving a racially neutral and unbiased physical description of the suspect." (§ 745, subd. (a)(2).)

As originally enacted, section 745 only applied prospectively to cases in which judgment had not been entered prior to January 1, 2021. (§ 745, former subd. (j); Stats. 2020, ch. 317, § 3.) This version of the statute permitted defendants to raise a violation by filing a motion in the trial court or, if judgment had been imposed, by filing a petition for writ of habeas corpus or a motion under section 1473.7 in a court of competent jurisdiction. (§ 745, former subd. (b); Stats. 2020, ch. 317, § 3.) The statute also mandated various remedies specific to the type of violation found and the procedural posture of the case when the violation was established. (§ 745, former subd. (e); Stats. 2020, ch. 317, § 3.)

As relevant here, when judgment has been entered and a court finds "that a conviction was sought or obtained in violation of subdivision (a), the court shall vacate the conviction and sentence, find that it is legally invalid, and order new proceedings consistent with subdivision (a)." (§ 745, subd. (e)(2)(A).)

The Legislature amended section 745 with the enactment of Assembly Bill No. 256 (2021-2022 Reg. Sess.), effective January 1, 2023. (Stats. 2022, ch. 739, § 2.) Among other changes, this amendment made the statute retroactive "[t]o all cases in which judgment is not final." (§ 745, subd. (j)(1).)

The Legislature then amended section 745 a third time through Assembly Bill No. 1118 (2023-2024 Reg. Sess.), effective January 1, 2024. (Stats. 2023, ch. 464, § 1.)

13

Assembly Bill No. 1118 added the following language to subdivision (b): "For claims based on the trial record, a defendant may raise a claim alleging a violation of subdivision (a) on direct appeal from the conviction or sentence." "The statute now provides that postjudgment CRJA claims based on the trial record may be raised on direct appeal from the conviction or sentence (including to cases with judgments entered before January 1, 2021)." (*People v. Lashon* (2024) 98 Cal.App.5th 804, 810.)[7]

### B. Principles of Statutory Interpretation

" ' " ' "When we interpret a statute, '[o]ur fundamental task . . . is to determine the Legislature's intent so as to effectuate the law's purpose. We first examine the statutory language, giving it a plain and commonsense meaning. We do not examine that language in isolation, but in the context of the statutory framework as a whole in order to determine its scope and purpose and to harmonize the various parts of the enactment. If the language is clear, courts must generally follow its plain meaning unless a literal interpretation would result in absurd consequences the Legislature did not intend. If the statutory language permits more than one reasonable interpretation, courts may consider other aids, such as the statute's purpose, legislative history, and public policy.' [Citation.] 'Furthermore, we consider portions of a statute in the context of the entire statute and the statutory scheme of which it is a part, giving significance to every word, phrase, sentence, and part of an act in pursuance of the legislative purpose.' " ' " [Citation.]' " (*People v. Braden* (2023) 14 Cal.5th 791, 804 (*Braden*).)

"In determining [the Legislature's] intent, a court must look first to the words of the statute themselves, giving to the language its usual, ordinary import and according

---

[7] The respondent's brief, filed before the effective date of the most recent amendment, argues Stubblefield's claims under the RJA are not cognizable on appeal. That argument does not survive the most recent amendment, which expressly allows defendants to raise a claim based on the trial record on direct appeal from a conviction or sentence. This amendment allows Stubblefield to raise the RJA claim at issue here. At oral argument, the Attorney General conceded the amendment allowed Stubblefield to raise the claim on direct appeal.

14

significance, if possible, to every word, phrase and sentence in pursuance of the legislative purpose. A construction making some words surplusage is to be avoided." (*Dyna-Med, Inc. v. Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1386-1387 (*Dyna-Med*).)

### C. Interpretation and Application of the Racial Justice Act

#### 1. Factual Background

The police did not conduct a search of Stubblefield's house, and the prosecution did not introduce any guns into evidence. In closing arguments, defense counsel argued Doe's claims about Stubblefield using a gun were not credible. Counsel argued Stubblefield had no guns at the house, and that the police would have confirmed that fact if they had searched Stubblefield's house after Doe's report.

The prosecutor in closing arguments sought to explain the decision not to search Stubblefield's house as follows: "Now, there's no search of the defendant's house. What are some reasons why? Well, first of all, [Doe] hasn't identified [Stubblefield]. Second of all, they are aware we're dealing with somebody who was -- if he's not famous still, was famous at one time. *And, third, he's African-American.* [¶] So if you do a search on somebody's house with no identification, no real idea of the victim or what you're dealing with, that's just going to open up a storm of controversy. [¶] Can you imagine in Morgan Hill *when they search an African-American --.*" (Italics added.) Defense counsel objected at this point, and the trial court sustained the objection but did not admonish or instruct the jury in any fashion. Before moving on to another topic, the prosecutor added, "They had reasons for not doing the search."

#### 2. Judicial Notice of the Killing of George Floyd and Subsequent Events

Stubblefield contends the prosecution's statements referred to the events that followed the murder of George Floyd. The trial concluded prior to the enactment of the RJA, and the record includes no evidence or facts about Floyd's killing or the post-Floyd

15

conflict.[8] Section 745, subdivision (b) allows a defendant to raise "claims based on the trial record" on direct appeal from the conviction or sentence. As a threshold matter, we must decide whether we may consider facts about the post-Floyd conflict in our analysis of Stubblefield's claim.

Evidence Code section 459 provides for judicial notice by a court of review. In relevant part, a court of review shall take judicial notice of each matter the trial court was required to notice under Evidence Code section 451. (Evid. Code, § 459, subd. (a).) A court of review may take judicial notice of matters on its own motion. (See, e.g., *People v. Ramirez* (2022) 14 Cal.5th 176, 191, fn. 5 [California Supreme Court taking judicial notice on its own motion of agency policy regarding patient refusal of emergency medical services]; *Smith v. Selma Community Hospital* (2010) 188 Cal.App.4th 1, 45 [court of appeal taking judicial notice on its own motion of appellate record in prior appeal].)

The fact of Floyd's killing and the fact of the post-Floyd conflict fall well within the scope of judicial notice under Evidence Code sections 451 and 459. As a general matter, it has long been established that courts will take judicial notice of "contemporaneous events of general knowledge and repute." (*James v. Kuhn* (1932) 121 Cal.App. 69, 71 [taking judicial notice of the economic conditions caused by the Great Depression].) At the time of closing arguments in this case, the occurrence of Floyd's killing and the ensuing conflict were facts of "generalized knowledge" so "universally known" that they could not "reasonably be the subject of dispute," requiring judicial notice of those facts by the trial court and hence this court. (Evid. Code, §§ 451,

---

[8] The events following Floyd's killing included peaceful protests and demonstrations, but many gatherings were marred by violence or accompanied by riots and civil unrest. Reports and images of those incidents formed a substantial portion of the media's coverage, and as explained below, they are specifically relevant to whether the prosecution's statements appeal to racial bias. We use the term "conflict" to reflect the relevance of that aspect to the analysis.

16

subd. (f), 459, subd. (a).)  Many other general facts pertinent to Stubblefield's claim fall under the same code provisions—e.g., that the conflict included numerous large public gatherings and social unrest across the country, the approximate time frame in which they took place, and so forth.  The same is true of many facts establishing that the conflict was motivated by anger and discord that arose as the result of violent police encounters with Black persons—starting with the fact that Floyd was a Black man killed by a white police officer.

Given that this claim is raised for the first time on direct appeal, we approach the question of judicial notice with caution.  Less extraordinary public events or facts would give us pause, but the prominence and undeniable nature of the basic facts concerning these events make them an appropriate matter for this court to acknowledge, as other courts of this state have done as well as federal courts.[9]  (See, e.g., *People v. Flores* (2024) 15 Cal.5th 1032, 1053-1054 (conc. opn. of Evans, J.); *B.B. v. County of Los Angeles* (2020) 10 Cal.5th 1, 30 (conc. opn. of Liu, J.); *Jeffery v. City of New York* (2d Cir. 2024) 113 F.4th 176, 180 [taking judicial notice of media reports of Floyd-related demonstrations and violence, and concluding that the media reports were sufficiently widely publicized and documented to reflect "facts generally known" within New York City]; *Hussey v. City of Cambridge* (D. Mass., Mar. 12, 2024, No. 1:21-CV-11868-AK) 720 F.Supp.3d 41, fn. 3 [taking judicial notice of news about the unrest following Floyd's death as facts "not subject to reasonable dispute" under Rule 201, subdivision (b) of the Federal Rules of Evidence].)

---

[9] The events following Floyd's death were so consequential that they prompted the California Supreme Court to issue a public statement in reaction.  ("Supreme Court of California Issues Statement on Equality and Inclusion" <https://newsroom.courts.ca.gov/news/supreme-court-california-issues-statement-equality-and-inclusion> [as of Dec. 26, 2024] archived at <https://perma.cc/GT5F-PUXT>.)

After proposing to take judicial notice of these matters, we gave the parties an opportunity to present any information relevant to (1) the propriety of taking judicial notice of these matters and (2) the tenor of the matters to be noticed. (See Evid. Code, § 455, subd. (a).) Stubblefield responded that judicial notice was appropriate under Evidence Code section 451 and presented additional argument for why these matters were relevant. The Attorney General did not object and agreed that Floyd's death and the events that followed it were universally known facts but argued those matters were only "marginally relevant." Accordingly, on our own motion, we take judicial notice of the facts and propositions set forth above.

### 3. *Application of the Racial Justice Act to the Prosecution's Statements*

Stubblefield contends the prosecution's statements violated the RJA by appealing to racial biases and explicitly using Stubblefield's race against him. Stubblefield points out the context in which this proceeding occurred: Closing arguments began July 21, 2020, eight weeks after George Floyd's killing. The news and Internet were saturated with scenes of conflicts between police, rioters, protesters, and counter-protesters, fueling a racially motivated backlash by those who blamed Black people as the cause of the conflict. Stubblefield argues the prosecution's argument tapped into this "white rage" by blaming Stubblefield's race for a flaw in the prosecution's case and implying that if jurors did not convict him, it would amount to letting him go free because he was Black. The Attorney General contends any violation constituted harmless error.

Before we address the merits of Stubblefield's claim, we consider whether and how the post-Floyd conflict would factor into the analysis under the applicable legal standards.

### a. *Relevance of the Events Following Floyd's Killing*

The prosecution's statements did not explicitly mention the Floyd murder or the ensuing conflict, raising the question whether the statements might be understood as an implicit reference to the post-Floyd conflict. While that may be obvious to Stubblefield

18

or others familiar with the basic facts of the post-Floyd conflict, the plain language of section 745, subdivision (a)(2) does not expressly instruct courts on how to consider an implicit reference to events occurring in the world outside the courtroom.

In applying section 745, subdivision (a)(2), we must consider whether the prosecution's statements used "[r]acially discriminatory language," defined in relevant part as language that, "to an objective observer, explicitly or implicitly appeals to racial bias." (§ 745, subd. (h)(4).) The statute does not expressly define "objective observer," but its plain language offers some guidance in how to apply the standard.

First, the "objective" modifier implies the "observer" has no racial bias of their own or has set aside any bias relevant to their evaluation of the language in question. This interpretation is both natural and necessary; it would be absurd to assess racial bias from the standpoint of an observer who might be unable to recognize it or unwilling to acknowledge it because of their own racially biased perspective. Of course, no such "objective observer" exists; the statute implicitly invites the court to step into the shoes of an "objective observer" in evaluating the language in question.

Second, the text of section 745, subdivision (a)(2), defines the use of racially discriminatory language about the defendant's race to be a violation "whether or not purposeful." (See also *Bonds v. Superior Court* (2024) 99 Cal.App.5th 821, 829 [holding "implicit bias is, by definition, *un*intentional and *un*conscious" in considering a claim raised under Section 745, subdivision (a)(1)].) Thus, the statute directs the "objective observer" to disregard whether the person using the discriminatory language intended for it to be discriminatory. This further implies it does not matter whether the speaker thought the language would be interpreted as discriminatory by anyone else who heard it.

With that understanding, a court might interpret the "objective observer" standard to mean the court should (1) neutralize any racial biases the court might have; (2) ignore whether the speaker intentionally used the language for a racially discriminatory purpose; and (3) proceed to determine whether the language is racially biased, either explicitly or

19

implicitly. But that misconstrues an element: The "objective observer" standard requires the court to determine whether the language "explicitly or implicitly *appeals to* racial bias." (§ 745, subd. (h)(4), italics added.) If the statute were interpreted as covering language that, "to an objective observer, explicitly or implicitly, *is* racially biased," that would misconstrue the phrase "appeals to" or otherwise render it surplusage. When interpreting statutory text, courts must "accord[] significance, if possible, to every word, phrase and sentence in pursuance of the legislative purpose. A construction making some words surplusage is to be avoided." (*Dyna-Med*, *supra*, 43 Cal.3d at p. 1387.)

Section 745 does not define the term "appeals" as used in subdivision (h)(4). The relevant dictionary definition in this context is the intransitive verb form meaning, "to arouse a sympathetic response." (Merriam-Webster Dictionary Online (2024) <https://www.merriam-webster.com/dictionary/appeals#dictionary-entry-2> [as of Dec. 26, 2024] archived at <https://perma.cc/9ASS-VHVS>.) A "sympathetic response" refers to the effect of the language on a person hearing it. Thus, the statute's inclusion of the word "appeals" necessarily requires the "objective observer" to consider the potential effect of the language on a person hearing it—i.e., whether the language appeals to a person's racial bias.

Furthermore, "[r]acially discriminatory language" includes language that "*implicitly* appeals to racial bias." (§ 745, subd. (h)(4), italics added.) But when a defendant claims the language implicitly appeals to racial bias by indirectly referencing something that is not necessarily a matter of common knowledge, the court needs to consider whether or how a person would understand that reference—or, by the same token, what assumptions an "objective observer" would adopt in evaluating the effect of the language. More specifically, when the language is claimed to be an implicit reference to an event not expressly mentioned or explained in the language, we must consider whether a person hearing the language would even be aware of that event.

The plain text of section 745, subdivision (h)(4) sets the "objective observer" alone in a contextual vacuum, devoid of any facts, knowledge, or information about the outside world.  (§ 745, subd. (h)(4).)  But the statute does not exclude language that might require a person to have additional context to understand the language; to the contrary, the definition of "[r]acially discriminatory language" includes "racially *charged* or racially *coded* language."  (*Ibid.*, italics added.)  Indeed, the RJA requires defendants to present evidence of the facts necessary to establish a violation, and in some cases, that would include evidence relevant to a person's knowledge or awareness of certain facts or events.  (See, e.g., *People v. Howard* (2024) 105 Cal.App.5th 625 (*Howard*) [language that does not explicitly appeal to racial bias may require a defendant to provide additional context and facts to make a prima facie case under the RJA.])  In some cases, the contextual basis for an implicit appeal to racial bias may consist of facts or events so commonly known—e.g., the historical fact of slavery—that it may be reasonable to assume a listener is aware of them.

Stubblefield contends the prosecution's statements were a reference to the post-Floyd conflict.  This court acknowledges the Floyd killing and the events of the post-Floyd conflict; that these events took place is a fact of "generalized knowledge" so "universally known" that it could not "reasonably be the subject of dispute."  (See Evid. Code, § 451, subd. (f).)  We will therefore evaluate Stubblefield's claim with the assumption that a person listening to the prosecution's statements would be aware of the post-Floyd conflict and aware that the central dispute underlying the conflict concerned the use of force by police in encounters with Black persons.

Some might find that result to be obvious as a matter of common sense, such that a court might just as well evaluate the prosecution's statements with the unstated assumption that awareness of the post-Floyd conflict was a given.  However obvious the result might be in this case, we set forth our analysis based on our understanding of the statute: that it requires us to consider the potential effect of the language on a person

21

listening to it, and in some cases, that depends on a person's knowledge. This interpretation is consistent with the plain language of the statute as well as the Legislature's intent to address implicit racial bias in the legal system. "Implicit bias, although often unintentional and unconscious, may inject racism and unfairness into proceedings similar to intentional bias." (Stats. 2020, ch. 317, § 2, subd. (i).)

### b. The Prosecution's Statements Violated the Racial Justice Act

The prosecutor explicitly mentioned Stubblefield's race twice. The prosecutor began describing "some reasons why" there was no search of Stubblefield's house, starting with the fact that Doe had not identified Stubblefield. The prosecutor asserted a second reason—that police were aware Stubblefield was famous. The prosecutor then explicitly raised Stubblefield's race: "[T]hird, *he's African-American.*" (Italics added.) Next, the prosecutor asserted an explanation for why these facts would matter to the police: "*So* if you do a search on somebody's house with no identification, no real idea of the victim or what you're dealing with, *that's just going to open up a storm of controversy.*" (Italics added.) The prosecutor immediately followed this by asking the jury, "Can you imagine in Morgan Hill when they search an *African-American --*," before the prosecutor was cut off by an objection.

The record clearly establishes several elements required for a violation of the RJA under section 745, subdivision (a)(2). The prosecutor was "an attorney in the case," and he made the statements in closing arguments, "[d]uring the defendant's trial, in court and during the proceedings." Furthermore, the prosecutor was not "relating language used by another that is relevant to the case." (*Ibid.*) Nor can the statements be characterized as "giving a racially neutral and unbiased physical description of the suspect." (*Ibid.*)

The prosecutor did not use Stubblefield's race as an incidental fact that might make it relevant under a racially neutral theory—for example, as evidence supporting a witness's identification of a suspect. Rather, the prosecution identified Stubblefield's

22

race as a factor in law enforcement's decision-making, making it one reason why there was no search of his house. On its face, this argument defies any racially neutral interpretation.

The record includes no evidence that Stubblefield's race played any role in law enforcement's decision not to search his house. The prosecution had no basis in the facts or evidence to assert that Stubblefield's race was a factor in the decision, that a search would "open up a storm of controversy," or that the police considered the possibility that it would. The argument was therefore unsupportable under any permissible theory of relevance. But even if there had been evidence to support those claims, the argument served no valid or permissible legal purpose or theory of relevance.

For the reasons below, we find the prosecution's statements, "to an objective observer, explicitly or implicitly appeal[] to racial bias," under section 745, subdivision (a)(2). The first problem is the argument invites the listener to consider Stubblefield's race in weighing the evidence. The prosecution's statements meant that if Stubblefield had not been a Black man, the police might well have decided to search his house. Whether a search would have uncovered a gun or confirmed the absence of one, the argument meant Stubblefield's race might well have impacted the state of the evidence, shifting the weight of it either against him or in his favor. Using race in that fashion invited the listener to consider the fact that Stubblefield was a Black man in weighing the evidence.

If a person was inclined to credit Doe's testimony that Stubblefield threatened her with a gun in the commission of the offense, that person would also be inclined to think a search of his house soon after the incident would have resulted in the gun being seized. Thus, if that person accepted the prosecutor's argument for why the police did not search the house, the person would likewise be inclined to believe the prosecution's case lacked a key piece of evidence against Stubblefield partly because he was a Black man. And if the person was apt to be angered by the perception of a successful Black man in a rape

23

case getting an undeserved advantage on account of his race, they might feel justified or even compelled by misguided notions of racial fairness to overlook or discount the absence of a gun.

For clarity, we note that section 745, subdivision (a)(2) and subdivision (h)(4) do not expressly require the defendant to show whether or how an appeal to racial bias could have affected a *juror* who was impaneled in this trial. Under subdivision (a)(2), a violation occurs if the racially discriminatory language is used "[d]uring the defendant's trial, in court and during the proceedings," but there is no requirement that a juror must hear the language. Application of the "objective observer" standard is the same regardless of how an appeal to racial bias might affect a juror's weighing of the evidence; the focus is on whether the challenged language would appeal to the racial bias of a person who simply hears the language. This interpretation is consistent with our conclusion below that the statute does not require a showing of prejudice to obtain relief. However, the potential effect on a juror is significant at a practical level, so we include it in our discussion here.

For the reasons above, we find the statement that Stubblefield's race was a factor in the police's decision-making, "to an objective observer, explicitly or implicitly appeals to racial bias," making it "racially discriminatory language" within the meaning of section 745, subdivisions (a)(2) and (h)(4).

The prosecution also explained *why* police would have second thoughts about searching Stubblefield's house: a search would "open up a storm of controversy." The prosecutor mentioned some racially neutral reasons for why a storm would result: "So if you do a search on somebody's house with no identification, no real idea of the victim or what you're dealing with . . . ." But viewed in the context of the preceding statement, the significance of Stubblefield's race is clear: "And, third, he's African-American. *So* if you do a search . . . ." (Italics added.) "So" in this context means "therefore." This

24

amounted to an express assertion that Stubblefield's race was part of the reason why a "storm of controversy" would result.

The prosecution emphasized this by explicitly raising Stubblefield's race a second time, asking the jury, "Can you imagine in Morgan Hill when they search an African-American --." We cannot know what the prosecutor would have said if the argument had not been cut off by an objection, and we make no assumptions about what he might have said. Looking only to the face of the language in the record, however, the inclusion of "Morgan Hill" and "search an African-American" in the partial statement further supports the finding above: that the prosecution's statements amounted to an express assertion that Stubblefield's race was part of the explanation for why a "storm of controversy" would result. Even if we ignore this partial statement, however, the preceding statements sufficiently establish that point.

We find the "storm of controversy" language enabled a potent appeal to racial bias in the context of the prosecution's statements as a whole. First, a person with a basic awareness of the post-Floyd conflict could easily and naturally perceive the prosecutor's statements to be a reference to that conflict. "Controversy" in consequence of police encounters with Black men was at the very heart of the post-Floyd conflict, and the conflict was nothing if not a "storm." Moreover, the highly visible nature of the conflict—in both the streets and the media—thrust it squarely into public consciousness. A listener who had any basic awareness of the conflict would have to be overly obtuse to lack the ability to associate the prosecutor's remarks with it.

Second, the racial aspects of the post-Floyd conflict generated strong feelings and opinions among many members of the public. For some, their perceptions and opinions of the conflict were based on preexisting racist beliefs about Black men, providing fertile grounds for an appeal to racial bias with a reference to the conflict. And the public was exposed to countless videos and photographs of riots, looting, and property destruction liable to make an indelible impression on many viewers. This meant any brief or vague

25

reference sufficient to evoke such images could be emotionally charged by them with no overt mention of the conflict or any details about it. Referring to the post-Floyd conflict in that way could effectively produce a high decibel "dog whistle."[10] To be clear, we neither infer nor imply that the prosecutor intentionally tried to exploit jurors' racial biases; again, consistent with the language of statute, our analysis is focused on the language, not whether the speaker had a discriminatory purpose.

An appeal to "racial bias" in this fashion would include an appeal to perceptions of the post-Floyd conflict shaped by the racist presumption that George Floyd and other Black victims of police violence were lawless criminals. From that perspective, the protests and demonstrations were an unjustified display of yet more lawlessness, and the police were universally blameless if not victims themselves. The prosecution's argument implicitly appealed to this perception of the post-Floyd conflict by using Stubblefield's race to conjure the threat of controversy as a deterrent to law enforcement, thereby deflecting blame away from the police while shifting it onto the protesters.

The prosecution's statements further enhanced that appeal by evoking images of riots or other civil disruption in the imagination of a listener. There was no evidence any "storm of controversy" would arise following a search, but the prosecution asserted one would happen anyway. The argument was cut short, but a listener could easily complete the picture themselves, because images of civil unrest had been appearing on televisions and computer screens for weeks. By indirectly associating Stubblefield with those events based on his race, the prosecution's statements implicitly appealed to the racial bias of

---

[10] The RJA's definition of "[r]acially discriminatory language" includes "racially coded language." (§ 745, subd. (h)(4).) Likewise, the phrase "dog whistle" is used by some commentators to mean "coded racial rhetoric." (See Terbeek, *Dog Whistling, The Color-blind Jurisprudential Regime, and The Constitutional Politics of Race*, (2015) 30 Const.Comm. 167.) In addressing a defendant's RJA claim, one trial court described the language at issue as " 'a subtle but nonetheless a discernible message, a kind of a *dog whistle* . . . to any stereotypes jurors may have held.' " (*Howard*, *supra*, 104 Cal.App.5th at p. 647, italics added.)

persons who viewed Black men in general as instigators of riots and looting. And while the RJA does not require showing how an appeal to racial bias might have impacted a defendant's trial, we note that the prosecution's statements implicitly appealed to the racial bias of a person who might feel compelled to "push back" on anti-police sentiment or remedy some perceived racial injustice—and who might feel justified in doing so when considering a Black man on trial.

For all these reasons, we find the prosecution's statements concerning a "storm of controversy," viewed in the context of the surrounding language, constituted "racially discriminatory language" under section 745, subdivision (a)(2).

To complete the analysis under subdivision (a)(2) of section 745, we turn to whether the prosecution's statements used "racially discriminatory language *about the defendant's race*" within the meaning of that subdivision. (Italics added.) With the first mention of the term "African-American," the prosecution used it specifically to describe Stubblefield, leaving no doubt that it referenced the defendant's race. But the prepositional phrase "about the defendant's race" in subdivision (a)(2) implies a certain degree of focus, requiring more than just a passing reference. The statute does not further define or clarify the scope of that phrase. Looking to the plain meaning of "about" as a preposition, various dictionary definitions include: "In reference to; relating to; concerned with," (American Heritage Dict. (5th ed. 2016) p. 5, col. 1.); "Concerning, regarding, with regard to, in reference to," (Oxford English Dictionary Online (2024) <https://www.oed.com/dictionary/about_adv?tab=meaning_and_use#6786990> [as of Dec. 26, 2024] archived at <https://perma.cc/MKT5-K743>); and, "with regard to," "concerned with," and "fundamentally concerned with or directed toward," (Merriam-Webster Dictionary Online (2024) <https://www.merriam-webster.com/dictionary/about#dictionary-entry-2> [as of Dec. 26, 2024] archived at < https://perma.cc/R8UK-V5MV>).

Stubblefield's race was not the sole focus of the prosecution's statements; they included mentions of several topics: the decision not to search Stubblefield's house; Doe's failure to identify Stubblefield; his fame or past fame; Morgan Hill; and the "storm of controversy" that would result from a search. The prosecutor mentioned Stubblefield's race *twice* during these statements. But the prosecutor did not simply make a list of topics; he presented race as an explanation for how certain factors adversely influenced the decision whether to search Stubblefield's house—specifically, that a "storm of controversy" would arise in part because he was a Black man. Stubblefield's race was a critical factor in that explanation.

At oral argument, the Attorney General argued that the victim's failure to identify Stubblefield's photograph was the primary factor put forth in the prosecutor's explanation. But Detective Woodland testified that she had located Stubblefield's name in two different databases, based on the phone number from which the texts to the victim originated, and the address he sent in a text to the victim. Detective Woodland also confirmed that Stubblefield previously had a firearm registered to him. Thus, while Detective Woodland offered the victim's nonidentification as the reason for the decision not to seek a warrant, it was not a convincing explanation for why the police would have feared a "storm of controversy" as the result of executing a search warrant. The prosecution's argument was only convincing as applied to Stubblefield *because of his race*—particularly to a person hearing the argument in the context of the post-Floyd conflict.

One can reasonably argue about whether, under the narrowest definition of "about" –i.e., "fundamentally concerned with or directed toward"—the prosecution's statements were "about the defendant's race." But such a narrow construction would be inconsistent with the Legislature's stated intent "to eliminate racial bias from California's criminal justice system because racism *in any form or amount*, at any stage of a criminal trial, is intolerable . . . ." (Stats. 2020, ch. 317, § 2, subd. (i), italics added.) Based on the

28

other, more typical definitions of "about"—e.g., "concerning," "regarding," "relating to," and "in reference to"—the phrase "about the defendant's race" includes the prosecution's statements. Stubblefield's race was a central factor in the explanation for the decision not to search, supporting a finding that the prosecution made statements "concerning," "regarding," "in reference to," or "relating to" his race. We find the prosecution's statements constituted "racially discriminatory language about the defendant's race" within the meaning of section 745, subdivision (a)(2).

The findings above are supported by a preponderance of the evidence. We therefore find the prosecution used racially discriminatory language about Stubblefield's race in violation of section 745, subdivision (a). Because the violation occurred during the prosecution's closing argument, preceding the jury's deliberations and verdict, we hold Stubblefield's conviction was sought or obtained in violation of section 745, subdivision (a).

## D. The Required Remedy

The Attorney General contends any RJA violations were harmless beyond a reasonable doubt. Stubblefield argues the RJA as applied here forecloses any prejudice analysis and mandates that we vacate his conviction and sentence automatically upon finding a violation of section 745, subdivision (a).

Except as set forth in subdivision (k) of section 745, subdivision (e) mandates that if the court finds a violation of subdivision (a), the court "shall impose" one of several enumerated remedies specific to the violation. The subdivision applicable in this case provides, "After a judgment has been entered, if the court finds that a conviction was sought or obtained in violation of subdivision (a), the court shall vacate the conviction and sentence, find that it is legally invalid, and order new proceedings consistent with subdivision (a)." (§ 745, subd. (e)(2)(A).)

The plain language of section 745, subdivision (e)—"the court shall impose a remedy"—mandates a remedy in this case. The plain language of the remedy specified in

29

subdivision (e)(2)(A)—"the court shall vacate the conviction and sentence"—likewise makes that remedy mandatory. No case-specific prejudice analysis is permitted by this language. The Court of Appeal for the Second District, Division 6, adopted the construction of the language in *People v. Simmons* (2023) 96 Cal.App.5th 323 (*Simmons*). "The statute forecloses any traditional case-specific harmless error analysis." (*Id.* at p. 337.) "The plain language of the statute . . . mandates that a remedy be imposed without requiring a show of prejudice." (*Ibid.*) We agree with the reasoning of *Simmons* and we adopt its interpretation of section 745, subdivision (e).

The Attorney General argues that section 745, subdivision (k) applies to this case. Subdivision (k) provides, "For petitions that are filed in cases for which judgment was entered before January 1, 2021, and only in those cases, if the petition is based on a violation of paragraph (1) or (2) of subdivision (a), the petitioner shall be entitled to relief as provided in subdivision (e), unless the state proves beyond a reasonable doubt that the violation did not contribute to the judgment."

The plain language of section 745, subdivision (k) limits it to "petitions" filed by a "petitioner." Stubblefield has not filed a petition and he is not a petitioner, so that subdivision does not apply to him. The Attorney General, however, argues that the word "petitions" in subdivision (k) should be construed to mean "petitions, motions, and appeals," such that a prejudice analysis is required for *all* violations of subdivisions (a)(1) and (a)(2) in cases where judgment was entered before January 1, 2021. The Attorney General argues this interpretation reflects the Legislature's purposes in enacting the RJA, the overall structure of section 745, and the legislative history behind it.

The Attorney General points out that section 745 as originally enacted applied only prospectively to cases in which judgment had not been entered prior to January 1, 2021. (§ 745, former subd. (j); Stats. 2020, ch. 317, § 3.) Furthermore, the original version of section 745 provided only two ways for defendants to raise a claim after the imposition of judgment: by filing a writ of habeas corpus or a motion under section

30

1473.7.  (§ 745, former subd. (b); Stats. 2020, ch. 317, § 3.)  That version of the statute did not include any provision allowing for harmless error analysis.  When the Legislature first amended section 745 through Assembly Bill No. 256 to make the RJA retroactive to all cases in which judgment is not final, the Legislature also added subdivision (k), requiring harmless error analysis for a certain class of petitions.  (Stats. 2022, ch. 739, § 2.)  Because the Legislature enacted these changes in tandem, the Attorney General argues they reflect the Legislature's recognition that it would be unfair to automatically reverse every case where the affected parties had no notice of the change in the law.  The Attorney General contends this unfairness principle applies equally to petitions, motions, and claims on appeal.  He asserts there is no logical reason why the Legislature would intend for subdivision (k) to apply to petitions but not to claims raised on direct appeal.

We are not persuaded.  First, the plain language of subdivision (k) is unambiguous:  It applies to certain "petitions" filed in cases where judgment was entered before January 1, 2021, and it applies "only in those cases."  This exception "expressly allows for a prejudice analysis in a narrow class of cases."  (*Simmons*, *supra*, 96 Cal.App.5th at p. 337.)  When the language of a statute is unambiguous, we follow its plain meaning as interpreted in the context of the statutory framework as a whole unless a literal interpretation would result in absurd consequences the Legislature did not intend.  (*Braden*, *supra*, 14 Cal.5th at p. 804.)  And contrary to the Attorney General's assertion, there is nothing unreasonable, much less absurd, about the differential treatment of writ petitions and claims on appeal.  Unlike a direct appeal, a petition for writ of habeas corpus provides an avenue of relief even in cases where the judgment has long been final.  Historically, such relief has been comparatively limited to preserve the finality of judgments.  "This limited nature of the writ of habeas corpus is appropriate because use of the writ tends to undermine society's legitimate interest in the finality of its criminal judgments, a point this court has emphasized many times."  (*In re Reno* (2012) 55 Cal.4th 428, 451.)

31

Furthermore, when the Legislature added subdivision (k) to section 745 with the enactment of Assembly Bill No. 256, the RJA contained no provision allowing claims to be raised on direct appeal. That version of the statute set forth procedures for raising postjudgment claims through writ petitions and motions under section 1473.7, but not on direct appeal. The most natural reading of the statutory text in effect at that time (prior to January 1, 2024) is that a violation of the RJA could *not* be raised on direct appeal.[11] It would have been anomalous if the Legislature had enacted subdivision (k) with the intent to make it applicable to a class of claims that did not exist at the time. And when the Legislature later amended section 745 through Assembly Bill No. 1118, allowing defendants to raise claims on direct appeal, that legislation made no changes to subdivision (k); the plain language of that subdivision, limiting it to "petitions," remained intact.

The Attorney General cites a passage from *Simmons* in support of his argument: "Subdivision (k) . . . limits any analysis of individualized prejudice to cases in which judgment was entered before January 1, 2021. This is a strong indication that the Legislature did not intend a case-specific prejudice inquiry to be performed in cases, like this one, where judgment was entered after January 1, 2021." (*Simmons*, *supra*, 96 Cal.App.5th at p. 337.) The Attorney General focuses on the *Simmons* court's reference to "cases" instead of "petitions" in this passage and concludes the court interpreted subdivision (k) the same way he does—i.e., that it applies to appeals as well as petitions. The Attorney General then draws a negative inference from the *Simmons* passage: that subdivision (k) is a strong indication the Legislature *did* intend a case-specific prejudice inquiry to be performed in all cases (including appeals) where judgment was entered *before* January 1, 2021.

---

[11] This is precisely the position the Attorney General takes in his respondent's brief, which he filed before the RJA was subsequently amended to allow for claims on appeal.

This argument reads far too much into the verbiage of *Simmons*. *Simmons* was decided in 2023, before Assembly Bill No. 1118 amended section 745 to allow for claims raised on direct appeal.[12] As the Attorney General notes, a petition for writ of habeas corpus was the primary avenue by which a defendant could raise a postjudgment claim under the RJA before that amendment took effect.[13] The term "cases" includes writ petitions, and at the time *Simmons* was decided, the postjudgment cases covered by the RJA were almost all petitions, so there was little point in differentiating between "cases" and "petitions" in reference to subdivision (k). Furthermore, *Simmons* concerned a case in which judgment was entered after January 1, 2021. (*Simmons*, *supra*, 96 Cal.App.5th at p. 332.) The *Simmons* court had no occasion to consider the applicability of subdivision (k) to RJA claims raised on direct appeal in a case where the judgment was entered before January 1, 2021. "It is axiomatic that cases are not authority for propositions not considered." (*People v. Ault* (2004) 33 Cal.4th 1250, 1268, fn. 10.)

However, the *Simmons* court's interpretation of section 745, subdivision (e) as mandating a remedy still applies in this case; the subsequent amendment allowing for claims on direct appeal did nothing to undercut the court's analysis of the text: Except in the case of petitions coming under subdivision (k), the plain language of subdivision (e) mandates that all courts finding a violation of subdivision (a) must automatically impose the specified remedy without harmless error analysis. (*Simmons*, *supra*, 96 Cal.App.5th at p. 337.) The *Simmons* court concluded this construction was consistent with legislative

---

[12] The Court of Appeal in *Simmons* had the occasion to consider an issue concerning the RJA because the appellant asserted trial counsel had rendered ineffective assistance by failing to raise a claim under the RJA in the trial court.

[13] The Attorney General makes this observation to explain why he initially took the position in his respondent's brief (filed before Assembly Bill No. 1118 took effect) that the use of "petitions" in subdivision (k) meant Stubblefield could not raise his RJA claims on appeal. He does not explain how Assembly Bill No. 1118—which made no changes to subdivision (k) or any reference to "petition[s]" in section 745—accounts for the reversal in his interpretation of subdivision (k).

33

intent as expressed by the declarations set forth in Assembly Bill No. 2542. (*Id.* at pp. 332-333.)

The Legislature's declarations include the following: "Even though racial bias is widely acknowledged as *intolerable* in our criminal justice system, it nevertheless persists because courts generally only address racial bias in its most extreme and blatant forms." (Stats. 2020, ch. 317, § 2, subd. (c), italics added.) "There is growing awareness that *no degree or amount of racial bias is tolerable* in a fair and just criminal justice system, . . . ." (*Id.*, subd. (h), italics added.) "It is the intent of the Legislature to eliminate racial bias from California's criminal justice system because racism in any form or amount, at any stage of a criminal trial, is *intolerable* . . . ." (*Id.*, subd. (i), italics added.) The Legislature's expressions of "zero tolerance" for racial discrimination in the legal system are consistent with the statutory language mandating automatic remedies for RJA violations established on direct appeal.

The Attorney General further contends his interpretation of section 745, subdivision (k) is supported by legislative materials prepared by the Senate and Assembly Committees on Public Safety in their analysis of Assembly Bill No. 1118. In summarizing the version of section 745 in effect at the time, both committees' reports referenced subdivision (k) as setting forth conditions "for *petitions (motions)* that are filed in cases for which judgment was entered before January 1, 2021, and only in those cases, . . . ." (Sen. Com. on Public Safety, Analysis of Assem. Bill No. 1118 (2023-2024 Reg. Sess.), as amended May 18, 2023, p. 3, italics added; Assem. Com. on Public Safety, Analysis of Assem. Bill No. 1118 (2023-2024 Reg. Sess.), as amended Mar. 15, 2023, p. 4, italics added.) The Attorney General argues that the committees' descriptions of subdivision (k) as including "motions" under section 1473.7 shows that subdivision (k) is not limited to writ petitions, and that it therefore includes claims raised on appeal as well.

Because the plain language of section 745, subdivision (k) unambiguously limits it to "petitions" in certain cases, "and only in those cases," we need not resort to legislative materials to aid our interpretation of the statute.  Even if we considered those materials, however, we see no reason to interpret a reference to "petitions (motions)" to mean "petitions, motions, and appeals."  The committees' reports contain nothing suggesting the Legislature intended for subdivision (k) to include claims raised on direct appeal.

For the reasons above, we reject the Attorney General's argument that section 745, subdivision (k) applies to violations of the RJA raised on direct appeal.  Having found that Stubblefield's conviction was sought or obtained in violation of section 745, subdivision (a), and the judgment having been entered, we conclude subdivision (e)(2)(A) requires us to vacate the conviction and sentence, find that it is legally invalid, and order new proceedings consistent with subdivision (a).

### III.    DISPOSITION

The judgment is reversed, and we find the conviction is legally invalid.  The conviction and sentence are vacated, and the matter is remanded to the trial court to conduct new proceedings consistent with Penal Code section 745, subdivision (a).

_____
     Greenwood, P. J.

WE CONCUR:

_____
     Grover, J.

_____
     Lie, J.

H048598
People v. Stubblefield

| | |
|---|---|
| Trial Court: | Santa Clara County Superior Court<br>Superior Court No.: F1660022 |
| Trial Judge: | The Honorable Arthur Bocanegra |

| | |
|---|---|
| Attorneys for Defendant and Appellant<br>DANA WILLIAM STUBBLEFIELD: | Joseph Vincent Doyle<br>under appointment by the Court of<br>Appeal for Appellant |
| Attorneys for Plaintiff and Respondent<br>THE PEOPLE: | Rob Bonta,<br>Attorney General of California |
| | Lance E. Winters,<br>Chief Assistant Attorney General |
| | Jeffrey M. Laurence,<br>Senior Assistant Attorney General |
| | Bridget Billeter,<br>Supervising Deputy Attorney General |
| | Moona Nandi<br>Deputy Attorney General |

H048598
People v. Stubblefield